Filed 12/7/22

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br>v.<br>JOHNNY CARABAJAL,<br><br>    Defendant and Appellant. | A162212<br><br>(Solano County<br>Super. Ct. No. FCR343307-A) |

A jury convicted defendant Johnny Carabajal of three counts of contacting or communicating with a minor with the intent to commit a sex offense.  (Pen. Code, § 288.3, subd. (a).)[1]  On appeal, defendant contends the trial court should have granted his motion for a new trial because one of the sitting jurors—Juror No. 5—was biased since she had applied for employment with the district attorney's office that was prosecuting him. Defendant makes additional contentions that section 288.3 is unconstitutionally vague and improperly restricts free speech; the evidence was insufficient to support the convictions; and the court gave conflicting jury

---

\*      Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of parts A and B of the Factual and Procedural Background, and parts B and C of the Discussion.

[1]      Further unspecified section references are to the Penal Code.

instructions that improperly removed the mental state element of section 288.3 from the jury's determination.

In the published portion of this opinion, we conclude the trial court did not abuse its discretion in denying a new trial. Juror No. 5's testimony at the posttrial evidentiary hearing provided substantial evidence supporting the court's finding of no actual bias, and the instant matter does not present an extraordinary case in which bias should be implied as a matter of law. In the unpublished portion of this opinion, we reject defendant's remaining claims. The judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

The victims in this case were friends of defendant's two daughters, S.C. and A.C.[2] E.M. (the victim in counts A and B), was a friend of A.C., while M.J. (the victim in count C) was a longtime friend of older daughter, S.C.

### A. Offenses Involving M.J.

In January 2016, defendant (then 54 years old) picked up M.J. (then 15 years old) from school and took her on a preplanned shopping trip. He had been giving M.J. car rides that week because M.J.'s mother was having car trouble. Earlier in the day, defendant sent M.J. a text message letting her know that S.C. had an appointment and would not be joining them. When defendant came to pick up M.J., his two sons were in the car, but defendant eventually dropped them off at home. Defendant and M.J. then went to a store where defendant bought M.J. a pair of shoes.

During the drive home, defendant made "nasty remarks" to M.J. He told her that he had "had sex with about 20 virgins," that she had "a nice ass," and that he had once seen her in a swimsuit and "wanted to fuck the

---

[2]     Pursuant to California Rules of Court, rule 8.90, governing "Privacy in opinions," we anonymize the names of the victim and witnesses.

shit out of" her. He also told M.J. that if she "were to do stuff" with him, he would help her get a car, her driver's license, and a birthmark removed, "just trying to bribe [her] with stuff." Defendant told M.J. that he could pick her up from school and that they could "do things" because they would have time alone together. Feeling uncomfortable from defendant's remarks, M.J. did not say anything back to him other than falsely telling him that her mother was calling for her to come home. Defendant told M.J. not to tell her mother, S.C., or anyone else about the things he had said, and to send him a text message later that night and "tell him what [she thought] about his ideas."

M.J. told S.C. about the incident by text message later that evening.[3] M.J. also told her mother the next day because M.J. was not comfortable with defendant taking her to school. When S.C. confronted defendant, he told S.C. that "[M.J.] took it the wrong way, and that he was very blunt with his words." Defendant later sent a text message to M.J. in which he apologized and said he was just trying to warn her to stay away from "broke motherfucker[s]," but M.J. and defendant had never discussed such a topic. M.J.'s mother called the police.

## B. Offenses Involving E.M.

In 2017, 15-year-old E.M. ran away from home and moved into a home with defendant's younger daughter, A.C. The home was owned by defendant's friend, and defendant lived nearby.

The first time they met, defendant told E.M. that she "reminded him of his ex-wife and that she was just so beautiful," which E.M. took as compliments. About a week later, E.M. was alone with defendant while he

---

[3] At trial, S.C. was asked whether M.J. said defendant "wanted to have intercourse or anything like that." S.C. testified, "Yes," but that M.J. did not name a particular act, just "[t]hat he wanted to do something."

drove her home from school. Defendant again said E.M. reminded him of his ex-wife, who "was sexy," and he also said E.M. was sexy. The remarks made E.M. feel uncomfortable, and she "knew it wasn't just a compliment." Defendant then asked E.M. that if she wanted to "do stuff" with him in the back seat of the car for $50 per week. E.M. did not think defendant was referring to sex, but "other things," such as a "hand job" or "that type of thing." E.M. "told him no" because she had sufficient financial support and "did not need [the] money."

About a month later, E.M. was "stuck at home with nothing to do" while A.C. was out with her boyfriend, so E.M. went with defendant to a tire shop. During the drive, E.M. saw that defendant had money and jokingly asked for some. In response, defendant said something like, "You know how you can make money." E.M. took the comment as a reference to his previous proposal to make $50 a week by doing "stuff" with him in the car.

On a different occasion, defendant made reference to the "pool room"—a room on his property with a bed in it where E.M. and A.C. would occasionally hang out. Defendant told E.M. that if the light was on, it meant "either he had a lady in there, or, like, [E.M.] can go in there and, like, join him on what he was doing, or whatever." E.M. thought he was hinting that he wanted to have "some type of sexual encounters with [her]. Like, not necessarily sex." E.M. never went to the pool room alone or at night.

Defendant warned E.M. that if she told anyone about his remarks, he "would completely disown [her] like he did his other daughter." E.M. did not immediately tell the police about defendant's comments because he was providing her "the only house" she had and she had nowhere else to live. However, E.M. eventually told defendant's daughters about his comments.

S.C. angrily confronted defendant, who accused E.M. of being a liar.  S.C. then told her grandmother, Wendy N.

When Wendy N. confronted defendant about whether he had offered E.M. $50 to have sex with him, he "just kind of laughed it off and said . . . he just wanted to see if she would do it[,] . . . to see if she was a whore or not and see if . . . she could earn her keep somehow because he said he was paying for her to live there."[4]  Wendy N. further testified that defendant said "it would be [E.M.'s] way of paying him back that she was living there free."  When Wendy N. asked defendant what he would have done if E.M. agreed, defendant "laughed it off.  He never answered [her] about that."  Wendy N. did not call the police or social services, but she urged A.C. to come live with her and recommended to E.M. that she return to her mother's house.

## C. Charges

The Solano County District Attorney's Office charged defendant with five counts:  forcible lewd act upon a child, A.C. (§ 288, subd. (b)(1), count one); attempted lewd act upon a child, A.C. (§§ 664/288, subd. (a), count two); two counts of contacting or communicating with a minor, E.M., with the intent to commit a sex offense (§ 288.3, subd. (a), counts three and four); and contacting or communicating with a minor, M.J., with the intent to commit a sex offense (§ 288.3, subd. (a), count five).[5]

---

[4]     At trial, Wendy N. initially testified that defendant "said" he was joking when he made the $50 offer to E.M.  Later, Wendy N. attempted to clarify that "he didn't say he was joking with her," but rather, "what he told me was that he—yeah, he did say that to her.  And I said, why would you say such a thing to her?  And he said he wanted to test her to see if she would really do it because he was supporting her, in his mind, by letting her live there because she had ran [*sic*] away from home."

[5]     This appeal concerns only the counts relating to E.M. and M.J.

5

The trial court granted defendant's motion to sever counts one and two. Counts three, four, and five (styled counts A, B, and C) then proceeded to trial.

**D. Trial, Motion for New Trial, and Sentencing**

Trial began with jury selection in January 2020.  The jury heard testimony on January 6, 8, and 9, and returned verdicts on January 9 convicting defendant of counts A, B, and C.

Defendant thereafter filed a motion for new trial due to juror bias, indicating the prosecutor recently informed him that during the trial, a sitting juror—Juror No. 5—had applied for employment with the Solano County District Attorney's Office and was subsequently interviewed and hired for the position.  Following an evidentiary hearing, the trial court denied the motion for new trial, finding there was no actual or implied bias.

Defendant was eventually sentenced to prison for two years and two months.  This timely appeal followed.

DISCUSSION

**A. Motion for New Trial for Juror Bias**

Defendant argues the trial court erred in denying his motion for a new trial because he demonstrated a substantial likelihood of Juror No. 5's bias based on the juror's application for employment with the very office that was prosecuting him.  We find no abuse of discretion by the trial court.

**1.** *Additional Background*

The prosecutor informed defendant on June 30, 2020, that Juror No. 5 had applied for employment as a victim-witness advocate with the Solano County District Attorney's Office on January 8, 2020 (the second-to-last day of trial), and that she was subsequently interviewed and hired by the district attorney's office in June 2020.

6

In July 2020, defendant filed his motion for new trial, and in September 2020, the trial court held an initial hearing on the motion. The court found that the Solano County District Attorney's Office was not aware of Juror No. 5's employment application until sometime after March 4, 2020, and in late June 2020, the prosecutor notified defense counsel that the juror had been hired. Based on the timeline of events, the court found that there was "an appearance of some sort of bias," but the court was not prepared "to say it is presumed or implied." The court decided to hold an evidentiary hearing to question Juror No. 5.

The hearing was held in November 2020. Juror No. 5 testified that she began working with the Solano County District Attorney's Office as a victim-witness advocate in June 2020. In this position, she supported victims (including victims of sexual offenses) and witnesses during the court process. Prior to this job, Juror No. 5 worked for Solano County Mental Health as a mental health specialist, a position she had held since April 2017. Before that, she had worked as a family advocate with an agency that was contracted by Solano County.

Juror No. 5 had been actively looking for a new job since December 2019 and checked the Solano County website for job postings every two or three weeks. In December 2019, she applied for two positions with Solano County (not with the district attorney's office). During defendant's trial, she did not look at the Solano County job website except on the evening of January 8, 2020, which was when she first saw the posting for the victim witness advocate position. No one told her to look at the Solano County job website on that date. She saw that the closing date for the position was January 13, 2020, so she applied "immediately" because she "was really looking for a different job. So when I saw something where I thought I had

opportunity, I . . . would apply for it." She testified that her decision was not influenced by what she heard during the trial, and she "actually thought a victim witness advocate maybe would work at the [Family] Justice Center. I did not really put the two together and thought I would be in the office at the DA." She applied for ten other jobs besides the position with the district attorney's office.

When she came to court on January 9, 2020 (the last day of trial), Juror No. 5 did not tell the other jurors that she had applied for the job. Nor did she tell the trial court because she did not think she would get the position or hear back immediately. Asked if her seeking employment with the prosecuting agency in the case affected her ability to be fair and impartial as she listened to the testimony and jury instructions and participated in deliberations, Juror No. 5 testified, "No."

Juror No. 5 did not hear back from the Solano County District Attorney's Office until January 31, 2020. After she began work at the district attorney's office in June 2020, she voluntarily told her supervisor (as well as the prosecutor in defendant's trial) in or around the first week of her employment that she had served on the jury in defendant's case. The reason she conveyed this information to her supervisor was because she was "asked by [her] supervisor if [she] had experience in the court or sitting in court or any kind of experience, and [she] honestly didn't" other than sitting as a juror. She did not believe that juror experience would have "been a plus" for the position she was seeking because "there are people who had a lot more experience in the court system than [she] had." Her service on the jury in question was her first experience with the criminal justice system.

Juror No. 5 further testified that she did not think her application created a conflict of interest with her service as a juror in defendant's trial

8

because "[w]hen [she] applied, [she] did not even think [she] would hear back or [she] would go further into the interview process." She did not believe that seeking the position affected her ability to be fair and impartial in defendant's trial, or that returning a guilty verdict would have helped her get the job or benefitted her employment in any way. She further testified that her decision to apply for the job did not influence her decision making during the trial. When she voted to convict defendant, she did not do so in the hopes it would help her get the job. She would have been comfortable telling her supervisor that she sat on the jury even if she had voted not guilty.

The trial court denied the motion for a new trial. The court explained that it heard Juror No. 5's testimony and reviewed the voir dire transcripts of Juror No. 5's questioning, and her voir dire answers were consistent with her testimony at the hearing.[6] The court expressed that its initial concerns were why and how Juror No. 5 applied for the position, but the court found, based on its observations of Juror No. 5's testimony and "her demeanor in testifying, thoughtful answers that she gave to the questions that were posed by both counsel and by the Court," that Juror No. 5 applied for the position at the "tail-end" of the trial "because she had been looking for a job for some time, a change of scenery, if you will," and "that's when she looked at the job website." The court further found that Juror No. 5 did not appear to be "influenced in any way by applying for employment with the [d]istrict [a]ttorney's [o]ffice one way or another" and that she apparently "did not believe that she would get any benefit by applying because of the fact that she's serving on a jury," as "she didn't mention to anyone in the [d]istrict [a]ttorney's [o]ffice that she served on a jury until she was asked by her

---

6      As the trial court found, Juror No. 5 had not been asked during voir dire if she was looking for another job.

9

supervisor whether she had any experience in the court process." The court concluded that Juror No. 5's conduct "does not in and of itself say that there was bias or implied bias of any sort. The witness testified that did not play any role in her decision-making process when she was deliberating." Accordingly, the court found no "implied or actual bias" in violation of defendant's due process rights.

### 2. *Analysis*

A criminal defendant may move for a new trial on specified grounds, including juror "misconduct by which a fair and due consideration of the case has been prevented." (§ 1181, item 3.) "The trial court has broad discretion in ruling on a new trial motion, and its decision will be disturbed only for clear abuse of that discretion." (*People v. Iraheta* (2014) 227 Cal.App.4th 611, 619.)

"Each criminal defendant is entitled to an impartial jury. [Citations.] That entitlement imposes upon each juror a duty to maintain impartiality throughout the trial. [Citation.] The loss of impartiality requires dismissal of the juror. [Citation.] . . . . A jury must be 'capable and willing to decide the case solely on the evidence before it,' lest a due process violation occur." (*People v. Mora and Rangel* (2018) 5 Cal.5th 442, 482–483 (*Mora*).) "If a juror's ability to perform his or her duty is called into question, a court is expected to hold a hearing; failure to conduct a sufficient hearing constitutes an abuse of discretion. [Citations.] Following a hearing, the trial court may discharge a juror if it finds that the juror is unable to perform his or her duty." (*Id.* at p. 483.)

"Precisely what constitutes ' "actual bias" ' of a juror may vary somewhat depending on the particular circumstances of the case. [Citation.] The United States Supreme Court has explained that bias, or impartiality, is

10

a state of mind rather than some specific course of conduct.  [Citation.]  In assessing whether that state of mind is present or not, the law makes room for a juror's humanity, understanding that a juror may not 'be totally ignorant of the facts and issues involved.'  [Citations.]  If a juror is able to set aside impressions and opinions to render a verdict based on the evidence presented in court, the juror is impartial.  [Citation.]  If, on the other hand, the juror forms an opinion so strong that the court is of the belief it cannot be set aside even if the juror does not express it, the juror will be adjudged biased.  [Citations.]  The evaluation of bias presents a mixed question of law and fact on appeal, the resolution of which obliges this court to review the trial court's examination and the juror's responses." (*Mora*, *supra*, 5 Cal.5th at p. 485.)

In *Smith v. Phillips* (1982) 455 U.S. 209 (*Smith*), a majority of the United States Supreme Court found no violation of due process on very similar—if not more serious—facts than those presented here.  The defendant in *Smith* moved to vacate his murder conviction on the ground that during the trial, a juror submitted an application for a position with the district attorney's office as a major felony investigator.  The prosecuting attorneys were informed one week before the end of trial that the juror had applied, but they did not disclose this information to the court and defense counsel until after the trial was concluded.  (*Id.* at p. 212.)  On review from denial of a habeas corpus petition, the majority in *Smith* held the defendant was not denied due process of law either by the juror's conduct or by the prosecutor's failure to disclose the application.  In so holding, the court explained that due process entitles the defendant to "a jury capable and willing to decide the case solely on the evidence before it" but "does not require a new trial every time a juror has been placed in a potentially compromising situation." (*Id.* at

11

p. 217.) "[T]he remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." (*Id.* at p. 215.)

*Smith* relied, in part, on *Dennis v. United States* (1950) 339 U.S. 162 (*Dennis*), in which the defendant was convicted of criminal contempt for failing to appear before the Committee on Un-American Activities of the House of Representatives. The defendant argued that the jury was inherently biased because it was composed primarily of federal government employees who were subject to discharge upon reasonable grounds of disloyalty to the government. (*Dennis*, at pp. 164–165.) As *Smith* observed, *Dennis* rejected the claim that implied bias based on the jurors' relationship to the government was sufficient for disqualification. Instead, " '[p]reservation of the opportunity to prove actual bias is a guarantee of a defendant's right to an impartial jury.' " (*Smith, supra,* 455 U.S. at p. 216, citing *Dennis*, at pp. 171–172.)

The trial court here properly afforded defendant due process of law by holding an evidentiary hearing that gave defendant the opportunity to prove actual bias on the part of Juror No. 5. (*Smith, supra,* 455 U.S. at p. 215; *Dennis*, 339 U.S. at pp. 171–172.) During that hearing, the trial court and defendant both explored whether the juror's application for employment with the prosecutor's office affected her ability to impartially decide the case based on the evidence before her. The juror's testimony provided substantial evidence supporting the trial court's finding of no bias. (*People v. Harris* (2008) 43 Cal.4th 1269, 1304–1305 [deferring to court's credibility determination based on juror's attestations of ability to deliberate impartially].)

Defendant argues nonetheless that a posttrial hearing is not always sufficient to assess juror bias. Borrowing language from Justice Marshall's

12

dissenting opinion in *Smith*, defendant contends that "[g]iven the human propensity for self-justification," a court is "unlikely to learn from a juror's own testimony after the verdict whether she was, in fact, impartial." Defendant also cites from Justice O'Connor's concurring opinion in *Smith* that "there are some extreme situations that would justify a finding of implied bias," such as "a revelation that the juror is an actual employee of the prosecuting agency." (*Smith, supra*, 455 U.S. at p. 222, O'Connor, J., concurring.)

We assume for the sake of argument that bias may be implied in appropriate circumstances. (See *Tinsley v. Borg* (9th Cir. 1990) 895 F.2d 520, 527 [noting the Supreme Court has never explicitly adopted or rejected the implied bias doctrine].) However, the instant matter does not present the kind of extreme or extraordinary circumstance that Justice O'Connor described in her concurring opinion, as Juror No. 5 was not "an *actual* employee of the prosecuting agency" at any time during the trial. (*Smith, supra*, 455 U.S. at p. 222, italics added, O'Connor, J., concurring.) Nor do defendant's other authorities addressing implied bias support a reversal on the facts here. (E.g., *United States v. Allsup* (9th Cir. 1977) 566 F.2d 68, 71–72 [finding substantial probability that two prospective jurors in bank robbery trial could not be impartial because they were employees of different branch of robbed bank]; *Tinsley*, at pp. 524–529 [no implied bias where juror in rape case failed to disclose prior social work and court testimony on behalf of another rape victim]; see also *People v. Terry* (1994) 30 Cal.App.4th 97, 102–103 [trial court erroneously but harmlessly denied challenge for cause against juror who was deputy district attorney in same office as prosecutor].)

Defendant's reliance on Justice Marshall's dissenting opinion in *Smith* fares no better. Justice Marshall wrote that "[i]n *cases like this one*, an

evidentiary hearing can never adequately protect the right to an impartial jury." (*Smith*, *supra*, 455 U.S. at p. 228, italics added.) He then detailed the particular facts of the case that showed the juror in question "was not a passive, indifferent job applicant." (*Id.* at p. 229.) As Justice Marshall explained, the juror began pursuing employment with the prosecuting agency "the same day he was sworn in" and asked a friend who worked in the criminal court to hand deliver his application to the district attorney's office, believing the friend to have a personal contact there. (*Ibid.*) The juror then regularly met with his friend and the jury warden to determine the progress of his application, and after the jury returned a guilty verdict, the juror contacted the district attorney's office "[t]he very next day." (*Ibid.*) Justice Marshall argued that "[w]hen a juror vigorously and actively pursues employment in the prosecutor's office throughout the course of a trial, the probability of bias is substantial," and "it is also unlikely that a post-trial evidentiary hearing would reveal this bias." (*Id.*, at pp. 229–230.) Thus, "where a juror pursues employment with the office of the prosecutor, under circumstances highly suggestive of misconduct or conflict of interest, bias should be 'implied,' and he [or she] should be automatically disqualified, despite the absence of proof of actual bias." (*Id.* at p. 231.)

Here, the evidentiary hearing reflected a very different picture. Juror No. 5's testimony indicated she was more of a "passive, indifferent job applicant" rather than one who was "vigorously and actively" pursuing employment with the prosecutor's office "throughout the course of a trial." (*Smith*, *supra*, 455 U.S. at p. 229, Marshall, J., dissenting.) As Juror No. 5 explained, she had been an employee of Solano County or a county-affiliated agency for many years and was actively in the process of looking for new employment with the county at the time she saw the victim witness advocate

14

posting on January 8, 2020, with an impending closing date. Indeed, she applied to ten other jobs besides the position with the district attorney's office. She did not think she would get the position or immediately hear back, nor did she think she would be working with the prosecutor in defendant's trial. After she began work in June 2020, she mentioned her jury service only because her supervisor asked about her experience in the courts, and she would have told her supervisor about her jury service even if she had voted not guilty. Based on her testimony, which the trial court found credible, Juror No. 5's conduct did not present a "circumstance[] highly suggestive of misconduct or conflict of interest" for which Justice Marshall urged bias should be implied. (*Smith, supra,* 455 U.S. at p. 231, Marshall, J., dissenting.)

Moreover, the posttrial evidentiary hearing here was not an ineffectual remedy in protecting defendant's right to an impartial jury. Rather, the trial court and counsel engaged in effective questioning that elicited detailed testimony providing the context for Juror No. 5's actions and a sound factual basis from which the court could find that her decision to apply to the prosecuting agency was not connected to and did not impact her jury service. From this, the trial court could reasonably conclude that Juror No. 5 remained "capable and willing to decide the case solely on the evidence before" her (*Smith, supra,* 455 U.S. at p. 217), and that therefore defendant's constitutional right to an impartial jury was not violated.

In sum, defendant was afforded due process through the posttrial evidentiary hearing. Juror No. 5's testimony at the hearing provided substantial evidence in support of the court's finding of no actual bias, and the instant matter does not present an extraordinary case in which bias

15

should be implied as a matter of law.  Accordingly, the trial court did not err in denying the motion for new trial.

## B. Section 288.3

Defendant challenges his conviction on the grounds that (1) section 288.3 is unconstitutionally vague and infringes on free speech; and (2) the evidence was insufficient to support the conviction.  Both challenges fail.

### 1. Vagueness and Overbreadth

Under section 288.3, subdivision (a), "[e]very person who contacts or communicates with a minor, or attempts to contact or communicate with a minor, who knows or reasonably should know that the person is a minor, with intent to commit an offense specified in Section 207, 209, 261, 264.1, 273a, 286, 287, 288, 288.2, 289, 311.1, 311.2, 311.4 or 311.11, or former Section 288a, involving the minor shall be punished by imprisonment in the state prison for the term prescribed for an attempt to commit the intended offense."  For purposes of the statute, " 'contacts or communicates with' shall include direct and indirect contact or communication that may be achieved personally or by use of an agent or agency, any print medium, any postal service, a common carrier or communication common carrier, any electronic communications system, or any telecommunications, wire, computer, or radio communications device or system."  (§ 288.3, subd. (b).)

Defendant argues section 288.3 is unconstitutionally vague because it lacks statutory guidelines for determining what it means to impermissibly "contact[] or communicate[]" with a minor.  Defendant argues, for example, that casual words, jokes, looks, glances, or smiles may trigger the statute's prohibition, and that this purported vagueness creates an unnecessary risk of chilling free speech.

16

These arguments were considered and rejected by the Third District Court of Appeal in *People v. Keister* (2011) 198 Cal.App.4th 442 (*Keister*). *Keister* held that arguments of vagueness based on the possibility that "a glance, wink, or smile" may establish a contact or communication for purposes of section 288.3 "do not address the issue of vagueness" because " '[t]he mere fact that close cases can be envisioned' does not 'render[] a statute vague.' " (*Keister*, at p. 448.) As *Keister* explained, " '[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is.' " (*Id.* at p. 449.) *Keister* concluded that whether a defendant made contact or communication with a minor with the requisite intent were "yes-or-no determinations, not subjective judgments" that rendered section 288.3 unconstitutionally vague. (*Keister*, at p. 449.)

*Keister* also rejected the argument that section 288.3 infringes on free speech since "[t]he only time the communication is criminal is if it is motivated by a specific intent to commit an enumerated sex crime." (*Keister*, *supra*, 198 Cal.App.4th at p. 449.) As the court explained, section 288.3 "has been written in a way that does not unconstitutionally restrict protected speech. Before the statute is violated, the defendant must know or reasonably should have known the other person was a minor, have the specific intent to commit an enumerated sex offense, and then contact or communicate with that minor or attempt to do so. [Citation.] Thus, without the unlawful sexual intent, the statute is not violated." (*Keister*, at pp. 449– 450.)

We agree with and adopt *Keister*'s analysis and conclusions that section 288.2 is not unconstitutionally vague and does not impermissibly infringe on

free speech. As defendant provides no persuasive grounds why this court should depart from *Keister*, his constitutional challenges lack merit.

### 2. Sufficiency of Evidence

Defendant argues the evidence was constitutionally insufficient to prove that his communications with the minors were done with the intent to sexually abuse them.

As to E.M., defendant argues it is highly unlikely she would have voluntarily gone with him to the tire store if, in fact, he had previously made the improper offer of $50 to engage in sexual acts. Defendant notes he never told E.M. to do anything in particular during the tire store trip, that E.M. did not seem bothered by their joking at the time, and that she never mentioned anything about the incident to S.C. or her mother that day. As for the pool room incident, defendant points to E.M.'s testimony that she was not sure what he meant by his remarks.

As to M.J., defendant first argues she falsely claimed she did not know S.C. would be absent from the shopping trip, as the evidence demonstrated that defendant had informed her by text message prior to the trip that S.C. had an appointment. Defendant further argues his statement to M.J. that he previously wanted to "fuck the shit out of" her was not an invitation to have sex, nor did it supply evidence of his intent at the time of the communication. He also contends "there was nothing to corroborate" M.J.'s testimony, and that text messages taken from her phone merely reflected M.J.'s discomfort with defendant. Defendant maintains that his remarks to M.J. were really about "the perils of dating people who had no money." Finally, defendant argues there was no other evidence that defendant continued to contact the girls after the initial encounters or sent them any sexually explicit messages.

18

" 'In reviewing the sufficiency of evidence under the due process clause of the Fourteenth Amendment to the United States Constitution, the question we ask is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citations.] We apply an identical standard under the California Constitution. [Citation.] 'In determining whether a reasonable trier of fact could have found defendant guilty beyond a reasonable doubt, the appellate court "must view the evidence in a light most favorable to respondent and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Young* (2005) 34 Cal.4th 1149, 1175.) "Even where, as here, the evidence of guilt is largely circumstantial, our task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might reasonably be reconciled with the defendant's innocence." (*People v. Zaragoza* (2016) 1 Cal.5th 21, 44.) " ' "Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " ' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 577.)

Under these well-settled standards, defendant's challenge to the sufficiency of the evidence necessarily fails. His attempt to cast doubt on the minors' testimony goes to their credibility, not the sufficiency of the evidence. Viewing the minors' testimony in a light most favorable to the judgment, we conclude the jury was provided with evidence from which they could find beyond a reasonable doubt that defendant made offers of money or other benefits to the girls in exchange for sexual acts. That defendant employed vague terms like "stuff" and "things" is immaterial, as the conversations in which the proposals were made were explicitly of a sexual nature, and both

19

M.J. and E.M. affirmatively testified that they understood his remarks to relate to sexual conduct. Defendant's intent to commit sex acts with the minors was reasonably inferred from the nature of his remarks—repeated indications of his sexual attraction to the girls followed by direct proposals for sexual favors in exchange for money or other benefits. That there was no evidence of further improper contacts by defendant is immaterial on substantial evidence review, as this goes to the weight of the evidence.

In sum, we reject defendant's contention that substantial evidence did not support the jury's finding that he acted with the requisite intent under section 288.3, subdivision (a).

## C. Alleged Instructional Error[7]

Defendant contends the trial court erred by instructing the jury pursuant to CALCRIM No. 370[8] that motive is not an element of the charged offenses, as this instruction conflicted with CALCRIM No. 1124 requiring the People to prove defendant's intent to commit lewd and lascivious acts.[9]

---

[7] The People contend defendant forfeited his claim of instructional error by failing to request modification of CALCRIM No 370 during the trial court proceedings below. However, we may review claims of instructional error, even though no objection was made in the trial court, if the substantial rights of the defendant were affected. (*People v. Mackey* (2015) 233 Cal.App.4th 32, 106; § 1259.) Under this authority, we will reach the merits of defendant's claim.

[8] The instruction under CALCRIM No. 370 was follows: "The People are not required to prove that the defendant had a motive to commit the crimes. In reaching your verdict, you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show that the defendant is not guilty."

[9] The instruction under CALCRIM No. 1124 stated, in relevant part, that to prove defendant's guilt under counts A, B and C, the People had to prove that when defendant contacted a minor, he "intended to commit lewd or lascivious acts involving that minor. . . . To decide whether the defendant

20

Defendant argues these "irreconcilably conflicting instructions effectively removed the mental element of the offense [under section 288.3] from the jury's determination." We find no error, and alternatively, no prejudice.

" 'We determine whether a jury instruction correctly states the law under the independent or de novo standard of review.' [Citation.] In reviewing a claim of instructional error, we 'must consider the jury instructions as a whole, and not judge a single jury instruction in artificial isolation out of the context of the charge and the entire trial record.' [Citation.] 'What is crucial . . . is the meaning that the instructions communicated to the jury. If that meaning was not objectionable, the instructions cannot be deemed erroneous.' " (*People v. Kumar* (2019) 39 Cal.App.5th 557, 563–564 (*Kumar*).) "We also 'consider the arguments of [trial] counsel in assessing the probable impact of the instruction[s] on the jury.' [Citation.] 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*Id.* at p. 564.) "If conflicting instructions on the mental state element of an alleged offense can act to remove that element from the jury's consideration, the instructions constitute a denial of federal due process and invoke the *Chapman* [*v. California* (1967) 386 U.S. 18 (*Chapman*)] 'beyond a reasonable doubt' standard for assessing prejudice." (*People v. Maurer* (1995) 32 Cal.App.4th 1121, 1128 (*Maurer*).)

To demonstrate defendant's guilt under section 288.3, the People were required to prove that defendant contacted or communicated with a minor "with intent to commit" one of the sex offenses enumerated in the statute. (§ 288.3, subd. (a).) Defendant argues the instruction under CALCRIM

---

intended to commit lewd or lascivious acts with a minor, please refer to the separate instructions that I will give you on that crime.

No. 370 removed this intent element from the jury's determination by indicating the People were not required to prove that defendant had a "motive" to commit the offenses. Although defendant acknowledges that motive is not an express element of section 288.3, subdivision (a), he insists the concept must be construed as an element because all offenses listed within the statutory scheme of sexual offenses against children necessarily involve "sexually motivated" conduct.

The instructions in question did not pose a conflict or misstate the law. Motive is not generally an element of a criminal offense (*Maurer*, *supra*, 32 Cal.App.4th at p. 1126), nor is it an express element of section 288.3. And as the California Supreme Court has explained, motive and intent are not synonyms but reflect " 'separate and disparate mental states.' " (*People v. Hillhouse* (2002) 27 Cal.4th 469, 504.) "Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice." (*Ibid*.) While an offender's motive may often *align* with his or her intent—i.e., to fulfill a desire to commit lewd or lascivious acts on the minor—that does mean the instructions on motive and section 288.3 given in this case were necessarily in conflict.

In *Maurer*, *supra*, 32 Cal.App.4th 1121 and *People v. Valenti* (2016) 243 Cal.App.4th 1140 (*Valenti*), the appellate courts held that a motive instruction similar to CALCRIM No. 370 improperly removed the mental state element required under a different sex offense, i.e., section 647.6. As *Maurer* observed, however, section 647.6 "is a strange beast" because it expressly required the prosecution to prove the defendant's motive—i.e., that the defendant engaged in acts or conduct that are " 'motivated by an unnatural or abnormal sexual interest.' " (*Maurer*, at p. 1126.) By contrast,

22

section 288.3 does not use the terms "motive" or "motivated" in articulating the requisite mental state of the offense.

That said, we acknowledge there may be a potential for confusion between the terms "motive" and "intent" as those words might be commonly understood. "[T]he audience for these instructions is not a room of law professors deciphering legal abstractions, but a room of lay jurors." (*Maurer*, *supra*, 32 Cal.App.4th at p. 1127.) Where, as here, it is suggested that jury instructions are so confusing as to violate fundamental ideas of fairness, "we inquire 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72; accord, *People v. Holt* (1997) 15 Cal.4th 619, 677.) In making this determination, we look to the trial record as a whole, including the other instructions given and the arguments of counsel, and presume the jury was able to understand and correlate the instructions. (*Kumar*, *supra*, 39 Cal.App.5th at pp. 563–564.)

Here, it is not reasonably likely the jury was led to believe it could convict defendant without finding his intent to commit sexual acts on the minors. In addition to CALCRIM Nos. 370 and 1124, the jury was instructed under CALCRIM No. 225 that "[t]he People must prove not only that the defendant did the acts charged, but also that he acted with a particular intent." Under CALCRIM No. 251, the jury was told that "[t]he crimes charged in this case require proof of the union, or joint operation, of act and wrongful intent. [¶] For you to find a person guilty of the crimes in this case of luring to commit lewd and lascivious act[s] . . . that person must not only intentionally commit the prohibited act, but must do so with a specific intent." To that end, CALCRIM No. 1124 instructed the jury on the specific intent element under section 288.3.

Additionally, the closing arguments of both the prosecution and the defense assisted the jury in the proper understanding that proof of defendant's intent was required to convict him. During closing arguments, the prosecutor specifically drew the jury's attention to CALCRIM No. 1124 and discussed the element of intent. After defining lewd or lascivious acts, the prosecutor explained it was immaterial to defendant's intent whether he succeeded in committing such acts, as his "intent was present" when he communicated the offers to the minors. Likewise, defense counsel repeatedly made clear to the jury that it had "to decide if[,] when [defendant] had contact with and communicated with these young women, that he had the specific intent when he made the communication. That's what 1124 of CALCRIM says. When the communication was made, he had the specific intent to commit the sex act." Later, defense counsel remarked, "You are being called upon to coolly and dispassionately make a decision if the government has proven beyond a reasonable doubt that when these communications happened, he intended to have sexual contact with these minors." Defense counsel further impressed upon the jury that "[t]he only way your vote can be guilty is if you believe beyond a reasonable doubt that in that moment he had the specific intent to have sexual contact with her." On rebuttal, the prosecutor once again pointed the jurors to CALCRIM No. 1124 for "the elements of this crime" and argued that "the intent was made when the comments were made." At no time did the prosecution or defense make remarks that would have created or reinforced a mistaken belief that the jury could find defendant guilty under section 288.3, subdivision (a), without finding that he had the requisite intent under the statute.

24

On this record, we conclude defendant fails to demonstrate a reasonable likelihood that the jury interpreted the instruction under CALCRIM No. 370 to remove from its consideration the element of intent.

In any case, any perceived error in instructing the jury under CALCRIM No. 370 was harmless beyond a reasonable doubt. (See *Maurer*, *supra*, 32 Cal.App.4th at p. 1129 [applying *Chapman* standard of prejudice where instructions remove element from jury's consideration].) "In making this determination of harmlessness, we must ask 'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." ' " (*Maurer*, at p. 1129.) "Significant in this regard is whether the evidence is ' "of such compelling force as to show beyond a reasonable doubt" that the erroneous instruction "must have made no difference in reaching the verdict obtained." ' " (*Ibid.*) We will not find the error harmless " ' "where the defendant contested the omitted element and raised evidence sufficient to support a contrary finding." ' " (*Valenti*, *supra*, 243 Cal.App.4th at p. 1166.)

Here, the evidence of defendant's intent to commit sex acts with E.M. and M.J. was compelling. Both minors testified that defendant made express proposals to give them money and other benefits in exchange for what they reasonably understood to be sexual acts. In making these proposals, defendant openly expressed his sexual attraction to each of the minors. As to M.J., defendant not only complimented her looks ("a nice ass") but told her that he once "wanted to fuck the shit out of" her before proposing that they "do stuff" alone, and then later asking her to message him "about his ideas." Defendant called E.M. "sexy," offered her money to do things in the back seat of his car, and invited her to a room in his house where he sometimes "had a lady in there." Defendant was alone with each minor when making the

25

statements, and he cautioned both girls not to tell anyone about their conversations. Despite the defense's efforts to undermine the minors' credibility, M.J.'s immediate reporting of the incident was corroborated by the testimony of her mother and S.C. as well as the text message evidence admitted at trial, while E.M.'s account was corroborated by Wendy N., who testified that defendant admitted to propositioning E.M.

Defendant maintains that a rational juror could have come to a different conclusion and viewed his remarks simply as crude jokes. In support, he cites *Maurer* and *Valenti*, but we find both cases sharply distinguishable. In *Maurer*, the appellate court found that the defendant was prejudiced by an instruction similar to CALCRIM No. 370 because the evidence showed that the defendant and the minor were "confidants"; they "freely discussed sexual and nonsexual matters, sometimes in a counseling mode," and their discussions of sexual matters were usually in a joking way. (*Maurer*, *supra*, 32 Cal.App.4th at p. 1131.) In *Valenti*, the court found the instructional error prejudicial because the defendant, a children's soccer coach, testified in his defense that he hugged some of the victims "in a nonsexual, innocent way," such to celebrate making a soccer goal. (*Valenti*, *supra*, 243 Cal.App.4th at p. 1167.) *Valenti* held that in assessing *Chapman* prejudice, "[t]he testimony of a single witness may be sufficient" to support an alternative conclusion on the omitted element, and the defendant's own testimony constituted significant countervailing evidence that his conduct was not motivated by an unnatural sexual interest in children. (*Valenti* at p. 1167.)

Defendant's reliance on *Maurer* and *Valenti* merely serves to underscore the distinguishing facts of the instant case. There was no evidence here that defendant and the minors were in a close relationship in

which they freely and frequently discussed sexual matters, or that the minors made sexually explicit or suggestive comments to defendant during the incidents in question or at any other time. Unlike the situation in *Valenti*, defendant did not testify as to his own state of mind, and he points to no other witness whose testimony supported the inference that he lacked sexual motivation in making his proposals to the minors. At best, E.M. testified that on the trip to the tire shop, she jokingly asked defendant for some money because she saw he had some, but the record confirms that she never testified or otherwise indicated that she made jokes or comments of a sexual nature with defendant, and she testified without contradiction that she felt uncomfortable by his multiple advances. Nor did Wendy N.'s testimony provide exculpatory evidence as to defendant's intent, as she testified that defendant troublingly suggested his proposal would have been E.M.'s "way of paying him back" or "earn[ing] her keep" for free housing, and he refused to answer Wendy N.'s query as to what he would have done had E.M. agreed. This was simply not a case where countervailing evidence supported an inference that defendant's proposals to the minors were other than sexually motivated.

Having carefully examined the record, we conclude it is beyond a reasonable doubt that the jury's verdict would have been the same had the CALCRIM No. 370 instruction not been given.

### DISPOSITION

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:


_____
Tucher, P.J.


_____
Rodríguez. J.

*People v. Carabajal*  A162212

28

Trial Court:   Superior Court of the County of Solano

Trial Judge:   Hon. Carlos R. Gutierrez

Counsel:   Law Offices of Bobbie Stein, Bobbie Stein, under appointment by the First District Appellate Project, for Defendant and Appellant

Rob Bonta, Attorney General of California, Lance E. Winter, Chief Assistant Attorney General, Charles C. Ragland, Acting Senior Assistant Attorney General, A. Natasha Cortina, Supervising Deputy Attorney General, Lynne G. McGinnis, Deputy Attorney General, and Kelley Johnson, Deputy Attorney General for Plaintiff and Respondent

*People v. Carabajal*  A162212